**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Silas Mills, | No. CV-24-00441-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| ALA Management Services, Inc., | |
| Defendant. | |

Plaintiff Silas Mills ("Mills") was a physical education teacher and basketball coach at a charter school operated by Defendant ALA Management Services, Inc. ("ALA") until his termination from the coaching role and subsequent resignation from his teaching role in 2022. Mills filed this lawsuit against ALA, alleging, among other claims, racial discrimination (Doc. 1). ALA moves to compel arbitration for all of Mills' legal claims pursuant to their employment contracts (Doc. 19 (ALA's Motion to Compel Arbitration)). ALA also requests a stay on this action pending completion of arbitration. (*Id.*) The parties have fully briefed the pending Motion (Docs. 21 (Mills' Response), 22 (ALA's Reply). Having reviewed the parties' briefs and the applicable law, the Court will grant ALA's Motion in part.

**I.    FACTUAL BACKGROUND**

Mills is an accomplished basketball player with experience playing in college and professionally overseas. (Doc. 1 at 3 ¶ 10.) After his playing career ended, Mills began teaching physical education and coaching basketball at a community college in Utah. (*Id.*

¶ 11.) Then, in late-2020, Mills moved to Arizona to become a teacher and the head coach of the varsity basketball team at one of ALA's charter schools—American Leadership Academy, Queen Creek. (*Id.* ¶ 13.) As part of his employment his with ALA, Mills signed three employment agreements (collectively, the "Teaching Agreements") and two other agreements for his part-time coaching role (collectively, the "Coaching Agreements"). (Doc. 19-1 at 7, 27.) The employment agreement for the 2020–21 school year (the "2020–21 Agreement") provides in relevant part:

> **13. Alternative Dispute Resolution.**
>
> **13.1** Should any dispute between Employee and Employer arise at any time out of any aspect of the employment relationship, including, but not limited to, the hiring, terms, conditions, or termination of employment, Employee and Employer will confer in good faith in an effort to resolve promptly such dispute.
>
> **13.2 In the event that Employer and Employee are unable to resolve their dispute, and should either desire to pursue a claim against the other party, both Employer and Employee agree that all disputes arising out of or related to this Agreement or their employment relationship shall be resolved by final and binding Arbitration. The Employee and Employer agree that the Arbitration shall be held in the county and state where Employee currently works for Employer or most recently worked for Employer. The Employee will provide a list of up to five (5) arbitration services or individual arbitrators, and Employer will choose from those provided options. If an arbitration service is selected, the Arbitrator will be selected in accordance with the procedures prescribed by that service. The award of the Arbitrator(s) is final and binding and may be entered as a judgment in any court of competent jurisdiction.**

(Doc. 19-1 at 10 (emphasis in original).) The agreement for the 2021–22 school year (the "2021–22 Agreement") modified this section to read:

> **13. Alternative Dispute Resolution.** With respect to any dispute between Employee and Employer that arises from or relates in any way to this Agreement (including any alleged breach hereof) of the parties' employment relationship, the Parties shall first meet and attempt in good faith to resolve their dispute through direct discussion. This discussion shall take place within a reasonable time (but not to exceed six months) after the dispute arises. If the dispute is not successfully resolved through this negotiation process, the aggrieved party may initiate the arbitration process if the dispute involves legal claims. To be clear, arbitration is not available for matters such as interdepartmental disputes, personality conflicts, differences of opinion over operational or academic decisions, and other types of disagreements that do not give rise to legal claims.
>
> **13.1 Claims Subject to Arbitration.** With the exception of injunction proceedings initiated by the Company and any claims Employee might have for workers' compensation or unemployment compensation benefits, all

> legal claims related to Employee's employment with the Company, or the termination of Employee's employment with the Company, will be subject to final and binding arbitration. Such claims, include, without limitation, claims for wages or other compensation, contract claims, tort claims, statutory claims, and claims for discrimination, harassment, retaliation, and wrongful termination. Employee understands that this provision applies to claims Employee might make against the Company, and to claims the Company might make against Employee. EMPLOYEE UNDERSTANDS THAT THIS MEANS BOTH THE COMPANY AND EMPLOYEE ARE WAIVING THEIR RIGHTS TO HAVE THEIR CLAIMS AGAINST ONE ANOTHER DECIDED BY A COURT OR A JURY.
>
> **13.2 Arbitration Procedures and Fees.** The party making the legal claim(s) will initiate proceedings through the American Arbitration Association (AAA); information about how to do that is readily available on AAA's website (adr.org). The parties will follow AAA's arbitrator selection process and other rules for employment arbitrations unless those rules conflict with this Agreement, in which case this Agreement will govern. Employee's share of the arbitration costs (other than fees charged by Employee's own counsel) shall be equivalent to the filing fee for initiating a lawsuit in the United States District Court for the District of Arizona unless Employee would be entitled to a waiver of such fee, which the arbitrator shall have the discretion to determine. Otherwise, all administrative costs of arbitration and the arbitrator's fee shall be paid by the Company. The parties will have all rights to conduct discovery and file motions that they would have under the Federal Rules of Civil Procedure. The arbitration hearing will be held in the county and state in which Employee works or last worked for Employer.
>
> **13.3** Arbitrator's Authority and Decision. The arbitrator, and not any court, shall have the exclusive authority to decide all issues of arbitrability, including whether this Agreement is enforceable and covers the claims at issue. Further, the arbitrator shall have the full authority to grant any party any relief such party could recover in a judicial action brought in court, and the same broad authority to manage the arbitration proceeding as a district court judge would have to manage litigation in federal court. The arbitrator will be asked to produce a written decision and award explaining the reasons for the arbitrator's disposition of the legal claims being arbitrated but will not be asked to produce findings of fact and conclusions of law. The arbitrator's award shall be final and binding. The prevailing party may seek confirmation of the award, and judgment upon the award, in any court of competent jurisdiction, and may seek an award of attorneys' fees and costs incurred in connection with such action.

(*Id.* at 16–17 (emphasis and capitals in original.)  The employment agreement for the 2022–23 school year (the "2022–23 Agreement") contains the same provisions.  (*See id.* at 23–24.)  The Coaching Agreements do not contain arbitration provisions.  (*See id.* at 27–28 (2020–21 Season Agreement), 29–30 (2021–22 Season Agreement).)

Mills claims that throughout his employment as the head basketball coach he was subjected to various discriminatory acts from senior staff, including suspicious surveillance

of his classroom, limiting available coaching tools, impeding planned basketball trips, and subjected to discriminatory animus from parents, in which ALA failed to adequately respond after he complained. (*Id.* at 4–8.) In January 2022, ALA removed Mills from the head coach position. (*Id.*) Plaintiff contends that he only accepted the teaching position because of his desire to coach, and after his removal from the role, he felt compelled to resign for the 2022–23 school year. (*Id.*)

Mills' lawsuit followed, alleging claims of unlawful racial discrimination under Title VII of the Civil Rights Act of 1964, racial discrimination under the Arizona Civil Rights Act ("ACRA"), retaliation, hostile work environment, constructive discharge, and intentional infliction of emotional distress. (Doc. 1.) ALA now seeks to compel arbitration on the basis that the arbitration provisions in the Teaching Agreements provided for mandatory arbitration for all legal claims related to Mills' employment, including those related to his coaching role. (Doc. 19 at 1.) Mills disagrees, arguing all claims except for the constructive discharge cause of action arise out of his role as a coach, not as a teacher, and otherwise, the arbitrations provisions are unenforceable and unconscionable. (Doc. 21 at 1.)

## II.     LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs arbitration agreements in any contract affecting interstate commerce. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119, (2001).[1] The FAA "reflect[s] both a 'liberal federal policy favoring arbitration' and 'the fundamental principle that arbitration is a matter of contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted). District courts apply state law principles governing the formation of contracts to determine whether a valid arbitration agreement exists. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under the FAA, "agreements to arbitrate [may] be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by

---

[1] Mills does not dispute the interstate nature of the contractual relationship between the parties. (Doc. 21.) Accordingly, and because Mills moved from Utah to Arizona for the teaching and coaching positions, the Court finds the agreements at issue affect interstate commerce. *See* 9 U.S.C. § 2.

- 4 -

1 defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (citation and internal quotations marks omitted). "Arbitration is 'a way to resolve those [contract] disputes—but only those disputes—that the parties have agreed to submit to arbitration.'" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).

"[T]he first question in any arbitration dispute must be: What have these parties agreed to?" *Id.* There are often three separate but interrelated disagreements in cases involving a disputed arbitration agreement. *See Osterhaus Pharmacy Inc., v. CVS Health Corp.*, No. CV-24-01539-PHX-JJT, 2024 WL 4785818, at *3 (D. Ariz. Nov. 14, 2024). As the Supreme Court has explained:

> First, [parties] disagree about . . . the merits of the dispute. Second, they disagree about whether they agreed to arbitrate the merits. That disagreement is about the *arbitrability* of the dispute. Third, they disagree about *who should have the primary power to decide the second matter*. Does that power belong primarily to the arbitrators (because the court reviews their arbitrability decision deferentially) or to the court (because the court makes up its mind about arbitrability independently)?

*First Options*, 514 U.S. at 942; *see also Coinbase*, 602 U.S. at 149 (describing these three disputes as layers: "(1) merits, (2) arbitrability, and (3) who decides arbitrability"). The second and third type of disagreement are matters of consent. *Coinbase*, 602 U.S. at 149. When a court decides whether parties agreed that arbitrators should decide arbitrability, the court "should not assume that the parties agreed to arbitrate arbitrability unless there is "clear and unmistakable" evidence that they did so." *First Options*, 514 U.S. at 945 (citation omitted) (cleaned up); *see also Lim*, 8 F.4th at 1000 (explaining a contractual provision delegating the issue of arbitrability to an arbitrator is known as a delegation clause or provision). "Even where a delegation clause clearly and unmistakably assigns the adjudication of arbitrability to an arbitrator, a party can nevertheless argue that the delegation clause itself is unenforceable under the relevant law of contracts." *Osterhaus Pharmacy*, 2024 WL 4785818, at *3 (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)). If the delegation provision is valid, the arbitrator must resolve all further issues

regarding arbitrability—including whether the agreement to arbitrate applies to the dispute at issue. *Brennan v. Opus Bank*, 796 F.3d 1125, 1133 (9th Cir. 2015); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68–69 (2019) (holding when parties "agree to have an arbitrator decide . . . whether their agreement covers a particular controversy," the court "may not decide the arbitrability issue").

Courts apply the standard governing summary judgment for the resolution of a motion to compel arbitration because it is in effect a summary disposition of whether the parties had a meeting of the minds to agree to arbitrate. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021).

### III. DISCUSSION

The parties' disputes center on whether Mills' claims are arbitrable and whether the Court or the arbitrator must decide issues of arbitrability. (*See* Doc. 19 at 7–9; Doc. 21 at 11–15.) The Court must first decide the threshold issue of whether the arbitrator or the Court decides arbitrability. Only then, may the Court reach the issue whether the parties agreed to arbitrate the merits of Mills' claims.

#### A. Who Decides Arbitrability?

ALA argues that the AAA arbitrator, as consented to in Section 13.2–3 of the 2021–22 and 2022–23 Agreements, and not the Court, must decide the threshold issue of arbitrability. (Doc. 19 at 7–9.) Mills disagrees and argues the Coaching Agreements do not include an arbitration agreement, so nothing precludes the Court from determining the arbitrability of his claims related to his coaching role. (Doc. 21 at 4–6, 11–12.)

Where parties have agreed to two contracts, one sending disputes to arbitration and the other sending disputes to the courts, a court must decide which contract governs. *Coinbase*, 602 U.S. at 150, 152 (noting otherwise delegation provisions would be impermissibly elevated over other forms of contract). To do so, the Court must assess whether the parties agreed to send the given dispute to arbitration. *Id.* at 150. Here, the dispute is whether the parties agreed to send the issue of who decides the arbitrability of the claims to an arbitrator or the courts.

Under Arizona law, an enforceable contract requires "an offer, acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained." *Rogus v. Lords*, 804 P.2d 133, 135 (Ariz. Ct. App. 1991); *see also Hayford v. Santander Consumer USA Inc.*, No. CV-20-01808-PHX-JJT, 2021 WL 3934328, at *3 (D. Ariz. Aug. 11, 2021) (noting the FAA requires an arbitration agreement to be in writing). "The fundamental prerequisite to arbitration is the existence of an actual agreement or contract to arbitrate." *Escareno v. Kindred Nursing Centers W., L.L.C.*, 366 P.3d 1016, 1020 (Ariz. Ct. App. 2016). There is no dispute that the Coaching Agreements do not contain an arbitration agreement. Instead, ALA attempts to fold Mills' contractual obligations as a coach into the Teaching Agreements to trigger the arbitration clause and thereby the delegation of the decision of arbitrability to an arbitrator. On these facts, however, ALA has not sufficiently done so through clear and unmistakable evidence. *See First Options*, 514 U.S. at 945.

All three Teaching Agreements contain nearly identical provisions detailing Mills' duties as a teacher. (*See* Doc. 19-1 at 7–9, 13–15, 20–22.) First, the agreements provide that "[d]uring the term of this Agreement, Employee shall provide instruction to the School's students on the courses of study assigned to the School's authorized representatives, perform other duties as indicated below, and perform such other duties as customarily performed by one holding Employee's position in same or similar schools." (*Id.* at 7, 13, 20.) The agreements then provide various duties. (*See id.* at 8–9, 14–15, 21–22.) Mills' duties included requiring him to teach during working hours, teach an approved curriculum, provide tutoring, work afterhours related to professional development, club meetings, parent-teacher conferences, and other events designed by the school, and various other reporting and communication requirements. (*See id.*) None of these duties, however, encompass his role as the head basketball coach. And notably, the Teaching Agreements also separately address pay, benefits, and indicate that they are fully integrated written contracts. (*Id.* at 11, 17, 24.) Despite devoting most of its briefing conflating these agreements with the Coaching Agreements, the Coaching Agreements

provide for a separate term of employment, pay, duties, and even supervisors. (*See id.* at 27–28, 29–30.) It is evident that the parties executed these contracts separately to individually govern two varied roles. Put simply, they are independent agreements.

Having found the teaching and coaching contracts are two separate contracts, albeit with overlapping time periods, the absence of an arbitration agreement in the Coaching Agreements entirely negates any possibility that Mills consented to an arbitrator deciding the issue of arbitrability of claims arising out of his coaching role. *See Johnson v. Walmart Inc.*, 57 F.4th 677, 682–83 (9th Cir. 2023) ("Where two contracts are 'separate,' 'the lack of an arbitration clause means disputes over the agreement are not subject to arbitration.'" (citation omitted)). On the other hand, the Teaching Agreements include arbitration provisions, with the caveat that the 2020–21 provisions did not include a delegation clause. The Court's inquiry then, is to what extent Mills' claims arise of his coaching role and those that pertain to his teaching role.

### B. What Claims Arise Out of Mills' Coaching Role?

As noted, Mills asserts claims of discrimination under Title VII and the ACRA, retaliation, hostile work environment, constructive discharge, and intentional infliction of emotional distress. ALA proclaims broadly that the Teaching Agreements cover all legal claims arising out of Mills' "employment," and are otherwise so intertwined that the allegations related to coaching are legal claims within the meaning of the Teaching Agreements. (Doc. 19; at 11–12; Doc. 22 at 2.) Mills contends that all but the constructive discharge claim arise of this employment as a basketball coach. (Doc. 21 at 4.) ALA's argument that the Teaching Agreements providing for arbitration of disputes related to Mills' "employment" does pass muster because, as discussed, the "employment" referenced in those agreements pertains to the teaching role, not coaching. ALA's argument as to the intertwined factual allegations and legal claims, however, requires further analysis.

Mills alleges six factual circumstances giving rise to the claims. (*See generally* Doc. 1.) First, Mills alleges that a staff member expressed dreams of becoming the head coach

and continuously argued with another coach during a game, the staff member began surveying Mills' classroom, Mills reported the staff member's actions towards the other coach to the Dean of Students and the Dean said nothing could be done, the staff member was promoted to Athletic Director, the now-Athletic Director gave him literature to improve his coaching, and that Mills anticipated that the now-Athletic Director would try to get him fired because of his complaints and ambitions to become head coach. (*Id.* at 4–5 ¶¶ 16–27.) Second, Mills alleges he was the only coach that did not receive access to an online film platform. (*Id.* at 5–6 ¶¶ 28–33.) Third, Mills alleges that following the Athletic Director's resignation, his successor and the director of the school impeded a planned basketball trip, but Mills was able to independently fundraise to make the trip happen. (*Id.* at 6 ¶¶ 34–39.) Fourth, Mills alleges the new Athletic Director required him to meet with a disgruntled parent, in which the parent demeaned him, later that same parent yelled profanities at him during a game, and ALA failed to intervene to stop the purported harassment. (*Id.* at 7–8 ¶¶ 40–49.) Fifth, Mills alleges that the director of the school met with him and told him that based on his race, Mills could not say certain things to his players. (*Id.* at 7–8 ¶¶ 50–56.) A week later Mills was fired from coaching in the middle of the 2021–22 season for not fitting the culture. (*Id.*) Finally, Mills alleges that the former Athletic Director replaced him as the head coach, rather than ALA promoting one of the other coaches. (*Id.* at 8–9 ¶¶ 57–63.) Collectively, these circumstances compelled Mills to resign from teaching. (*Id.*)

Mills seemingly concedes that only his constructive discharge claim arises out of his teaching role. However, as alleged, all of the purportedly discriminatory acts culminated into Mills' resignation that form the factual basis for the claim. "[W]hen a complaint contains both arbitrable and nonarbitrable claims, the [FAA] requires courts to 'compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.'" *KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (2011) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 214 (1985)). Here, there is no legitimate

dispute that the constructive discharge claim is subject to arbitration as it arises out of Mills' teaching role. And ALA has failed to cite authority that the single arbitrable claim being intertwined with the remaining claim justifies submitted all claims to arbitration. Therefore, the Court now turns to Mills' enforceability arguments.

### C. Are the Arbitration Provisions Enforceable?

Mills argues the arbitration provision in the 2021–22 and 2022–23 Agreements are unenforceable for four reasons: (1) the permissive language in Section 13 conflicts with the mandatory language in Section 13.1; (2) the term "Company" in Section 13.1 is incurably ambiguous; (3) the provisions are procedurally unconscionable; and (4) compelling arbitration exceeds the parties' expectations. (Doc. 21 at 6.)

As to the first reason, ALA replies by arguing Mills misreads the two provisions, and read together, the permissive may permits the aggrieved party to bring a suit to arbitration or abandon the claim, then Section 13.1 provides that all *legal* claims are subject to arbitration. (Doc. 22 at 2–3.) The Court agrees with ALA on this issue. To determine the parties' intent under a contract, the Court considers the plain meaning of the words and viewed in the context of the entire contract. *D.Q.S.A. LLC v. Am. Dairy Queen Corp.*, 680 F. Supp. 3d 1113, 1119 (D. Ariz. 2023) (applying Arizona contract law). Viewed in context, Section 13 of the 2021–22 and 2022–23 Agreements requires the parties to engage in a negotiation process for any dispute arising out of the agreements, only then may the aggrieved party initiate the arbitration process for "*legal* claims," and does not permit arbitration for non-legal claims. (*See* Doc. 19-1 at 16, 23 (emphasis added).)[2] Section 13.1 then removes various types of legal claims from arbitration, e.g., injunctive relief sought by ALA or Mills' claims for workers compensation or unemployment benefits. (*Id.* at 16, 23.) Mills' manufactured conflict neuters the parties' agreement to submit the appropriate legal claims to arbitration and would render them essentially meaningless. *D.Q.S.A. LLC*, 680 F. Supp. 3d at 1119 ("[R]eading of one contract provision must not render a related

---

[2] The 2020–21 Agreement contains a functionally similar provision (Section 13.1 in that agreement), which requires the parties to meet and confer before submitting legal claims to arbitration. (*See id.* at 10.) Therefore, the Court's analysis on this issue covers all three agreements as functionally the same.

- 10 -

provision meaningless."). Therefore, the Court refuses to read into the agreements a conflict that does not follow the plain meaning read in context.

Regarding the purported ambiguity of "Company," ALA again argues Mills reads the provisions out of context, and otherwise cherry-picks a term to create ambiguity. (Doc. 22 at 3–4.) And, again, the Court agrees with ALA. Mills attempts to direct the Court's attention to parol evidence of various documents with varying names of ALA entities. (*See* Doc. 21 at 7–8.) Under Arizona law, the Court "first considers the offered evidence and, if [it] finds the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor v. State Farm Mut. Auto. Ins.*, 854 P.2d 1134, 1140 (Ariz. 1993). But "the [Court] need not waste much time if the asserted interpretation is unreasonable[,] or the offered evidence is not persuasive." *Id.* at 1141. It is true that "Company" is undefined in the 2021–22 and 2022–23 Agreements. In context, however, the agreements use the term to refer to ALA. For example, in addressing which claims are subject to arbitration, Section 13 addresses disputes arising out of "the parties' employment relationship" and Section 13.1 states "all legal claims related to Employee's employment with the Company." (*See* Doc. 19-1 at 16, 23.) ALA is defined as the "Employer," i.e. the party providing the employment opportunity. (*See, e.g.*, *id.* at 7, 13, 20.) And as a matter of common sense, "Company" refers to the "Employer," which is ALA and includes its management of other entities like the schools. Therefore, whether the Court reads the agreements on their own or evaluates Mills' evidence, "Company" is not reasonably susceptible to differing interpretations and any purported ambiguity is unreasonable.

Next, turning to unconscionability, Mills' contention is one of unfairness and he expounds that he was hailed into the school's office to quickly sign the 2021–22 Agreement, the addition of the delegation clause was not explained to him, and the clause was inconspicuous because ALA did not bold the new language. (Doc. 21 at 9–10, 13–14.) ALA faults Mills for mischaracterizing the inconspicuousness of the delegation clause, and argues that the agreements are not adhesion contracts, that it had no obligation to explain

the clause to Mills, as he is not an unsophisticated party, and that he initialed near the new language. (Doc. 22 at 6–7.) Although there is a delegation clause shifting determinations on issues of arbitrability to an arbitrator, Mills has adequately challenged the enforceability of that clause and the Court must first consider the challenge before ordering arbitration on arbitrability. *See Osterhaus Pharmacy*, 2024 WL 4785818, at *4.

Procedural unconscionability addresses the fairness of the bargaining process, which "is concerned with 'unfair surprise,' fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should." *Clark v. Renaissance W., LLC*, 307 P.3d 77, 79 (Ariz. Ct. App. 2013) (quoting *Maxwell v. Fidelity Financial Services, Inc.*, 907 P.2d 51, 57–58 (Ariz. 1995)). But mere inequality in bargaining power is not sufficient. *Graham v. United Servs. Auto. Ass'n*, No. CV-20-02210-PHX-DWL, 2021 WL 2780865, at *4 (D. Ariz. July 2, 2021). "Even if the weaker party does not understand all of the terms included in an agreement, the agreement may be enforceable if it is consistent with reasonable expectations and not unduly oppressive." *Id.* (citation omitted) ("[T]he fundamental question is whether one party to a contract has unfairly or surreptitiously deprived the other of the right of access to the courts." (citation omitted)).

First, Mills' complaints about inconspicuousness of the changes in the 2021–22 Agreement providing for the delegation clause are without merit. As quoted above, *see* Section I, the 2021–22 Agreement sets out in capital lettering that the parties waive their rights to have courts or a jury decide their claims, proceeds to list new procedural rules in separately designated and numbered section, and bolds the "**Arbitrator's Authority and Decision**" followed by the specifics of the delegation. Mills initialed both pages at the bottom signifying he independently viewed each page. (Doc. 19-1 at 16–17.) Mills claims to have viewed the agreement and that it looked "just like the teaching agreement that [he] signed the previous year." (Doc. 21-1 at 2 ¶ 12.) It is simply not true that the agreements looked the same, when the typeface, bolding, numbering, and length all varied. The purported surprise seemingly stems from Mills' failure to actually read what he

acknowledged and signed. At bottom, Mills seeks relief from a binding provision in contract without making a showing of unconscionability. *See, e.g. Nelson v. Rice*, 12 P.3d 238, 243 (Ariz. Ct. App. 2000) ("Courts should not assume an overly paternalistic attitude toward the parties to a contract by relieving one or another of them of the consequences of what is at worst a bad bargain . . . and in declaring the contract at issue here unconscionable." (cleaned up)). Therefore, the Court declines to find the delegation clause unconscionable.

For similar reasons, Mills' arguments about reasonable expectations also fail. Ordinarily, there is a presumption that the terms of a contract are valid and enforceable. *Harrington v. Pulte Home Corp.*, 119 P.3d 1044, 1050 (Ariz. Ct. App. 2005). The reasonable expectations doctrine may rebut that presumption where one party has reason to believe that the assenting party would not do so if he knew the writing contained a particular term. *Myers v. Racerworld LLC*, No. CV-21-01244-PHX-MTL, 2022 WL 1569080, at *4 (D. Ariz. May 18, 2022). The "'reason to believe' may be shown by the parties' prior negotiations or inferred from the fact that the challenged term is bizarre or oppressive, eviscerates the non-standard terms explicitly agreed to, or eliminates the dominant purpose of the transaction." *Id.* (quoting *Darner Motor Sales, Inc. v. Universal Underwriters Ins.*, 682 P.2d 388, 397 (Ariz. 1984)). The 2020–21 Agreement included an arbitration provision, of which Mills does not take issue with generally, but rather he claims the changes in the next two renewal exceeded reasonable expectations. With the benefit of hindsight, Mills claims that he would not sign the same contract today and would have sought counsel, (Doc. 21 at 2 ¶¶ 14–15), but has provided no reasoning as to why the decision on arbitrability falling to an arbitrator or changes in the terms of the arbitration provisions played a dominant purpose in his assent to the employment agreement. Nor does he make a showing that the terms are oppressive or eviscerates non-standard terms. If anything, the changes to the provisions clarify their meaning and further the purpose of having an arbitrator decide legal disputes, including those related to arbitrability. Thus, Mills' argument fails.

### D. Should the Court Impose a Stay Pending Arbitration?

The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds*, 470 U.S. at 218. Accordingly, the FAA "require[s] that if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation." *KPMG*, 565 U.S. at 19. Where a party requests a stay pending arbitration, the FAA directs the Court to enter a stay to litigation after compelling arbitration under a valid arbitration agreement. 9 U.S.C. § 3.

Here, ALA requested a stay in this action if Mills pursues employment related legal claims through arbitration. (Doc. 19 at 12.) Mills did not address whether a stay was appropriate. (Doc. 21.) Having concluded that only the constructive discharge claim arises out of the Teaching Agreements subject to the arbitration provision and delegation clause, the Court will submit that claim to arbitration. For the remaining claims, however, the Court will stay proceedings pending completion of arbitration.

### IV. ATTORNEYS' FEES

ALA requests attorneys' fees and costs incurred in connection with filing its Motion. (Doc. 19 at 12.) The Court declines to award attorneys' fees and costs at this time.

### V. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant ALA Management Services, Inc.'s Motion to Compel Arbitration (Doc. 19) is **granted in part**.

**IT IS FURTHER ORDERED** compelling Plaintiff Silas Mills and Defendant ALA Management Services, Inc. to arbitration under the terms of the applicable arbitration agreement for the constructive discharge claim.

**IT IS FURTHER ORDERED** staying Plaintiff Silas Mills' remaining claims against Defendant ALA Management Services, Inc. for a limited period of time, to be determined by the parties' progress in engaging in and completing the arbitration process.

These parties shall file a joint status report by June 6, 2025, or within one week of a final arbitration decision, whichever is sooner.

Dated this 3rd day of December, 2024.

_____
Honorable Susan M. Brnovich
United States District Judge